UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HERBERT DEON GOODWIN, JR.<br><br>Petitioner,<br><br>v.<br><br>KATHLEEN ALLISON<br><br>Respondent. | Case No. 1:22-cv-00298-JLT-CDB  (HC)<br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY**[1]<br><br>**14-DAY DEADLINE**<br><br>(Doc. 11) |

On April 18, 2022, Petitioner Herbert Deon Goodwin, Jr. ("Petitioner"), a state prisoner proceeding pro se, filed an Amended Petition for Writ of Habeas Corpus alleging three grounds for relief ("Petition"). (Doc. 11). On July 19, 2022, Respondent filed an answer (Doc. 19), arguing Petitioner was not entitled to habeas relief, and lodged the state court record in support (Docs. 17, 17-1 through 17-10). After receiving an extension, Petitioner filed a traverse on November 15, 2024. (Doc. 26; *see* Doc. 25). For the reasons set forth below, the undersigned recommends that the district court deny the Petition and decline to issue a certificate of appealability.

---

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302(c)(17) (E.D. Cal. 2022).

## I.   PROCEDURAL AND FACTUAL BACKGROUND

A jury in the Fresno County Superior Court convicted Petitioner of (1) pimping related to victim S.M.; (2) pandering by encouraging related to victim S.M.; (3) human trafficking to commit another crime related to S.M.; (4) pimping a minor over 16 years of age related to victim A.J.; (5) pandering by encouraging a minor over age 16 related to victim A.J.; and (6) two counts of human trafficking of a minor for a sex act related to victim A.J.  (Doc. 17-8 at 1-2; Doc. 17-2 at 9-15).[2]  The court sentenced defendant to 36 years to life in prison.  (Doc. 17-8 at 7; Doc. 17-2 at 123-26).

On appeal, the Fifth Appellate District Court of Appeal summarized the pertinent facts of the underlying offenses:[3]

> On April 6, 2017, around 8:00 p.m., Fresno police received information relayed to them from the Las Vegas Police Department about a potential call for help made to a human trafficking hotline. The Las Vegas Police Department had traced the number used to call the hotline and determined the call had been made from Fresno, not Las Vegas. The police believed the caller had been kidnapped.
>
> The caller had originally identified herself as Kay Underwood. Police first investigated the location where the trace showed the call had been placed, but were unable to locate anyone in need. They then called the number associated with the call. On the first attempt, someone answered, but immediately hung up. On the second, a woman answered. Police asked if she was Kay Underwood and whether she was safe. The woman confirmed her identity and stated she was on a date. She asked the officer if he wanted to meet. The woman provided a description of her clothing and hair, and stated she was staying at a motel near Blackstone and Ashlan.
>
> Police then went to the motel to contact the caller. There, they saw a woman in the parking lot of the motel, matching the description they had been given, and contacted her. The initial interactions with the caller were recorded by a body camera. In the video and audio, the woman identified herself as A.J., said she was 17, and her birthday was in January 2000. Police asked her if she had called under a different name and she confirmed she had called the hotline as Kay Underwood. Her demeanor was described as stand-offish

---

[2] Record citations herein are to the CM/ECF-assigned pages.

[3] These facts are entitled to a rebuttable presumption of correctness.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1011 (9th Cir. 2015).

2

and nervous and she asked whether she and the officers could "get out of here," stating, "I really don't want to get caught." On the way to the police car, she was asked what she was doing there. She responded, "My pimp." At the car, after a few questions concerning whether she possessed any weapons or anything illegal, she was told she was not under arrest. She gave the officers the key to the motel room where she was staying. She told them where she lived and how long she had been a runaway. She stated she had called the human trafficking hotline a few weeks before. She stated she was on medications for depression. The police asked if she was injured or needed medical attention. The police explained they were there to help her and she was not in trouble. In response A.J. stated, "He's going to kill me!" A.J. was placed in the back of a police car, where she began to cry.

In response, the police explained they could protect A.J. and began asking questions about where her pimp was and how she contacts him. With the body camera turned off, police asked if A.J. knew the name of her pimp. She stated she did not, but described the car he drives and stated he would be calling her soon. The police did not ask follow-up questions about A.J.'s activities or about her pimp, believing that would occur later.

About 45 minutes after describing her pimp's car, a car matching that description drove into the parking lot. At that time, A.J. began to cry heavily and eventually confirmed the driver was her pimp. Appellant was arrested. A.J. was taken to the Child Protective Services Department.

A few days later, on April 10, police conducted an hour-plus interview with A.J. at her school to gather the information necessary for a proper human trafficking investigation.

Subsequent investigation showed appellant had rented two rooms at the motel where A.J. was located. This information led the police to identify an adult woman named S.M. S.M. testified at appellant's trial. She stated she had been in a relationship with appellant since 2016, during which time he had beaten her and worked as her pimp. S.M. explained that appellant would keep the money she earned and took possession of her belongings, including her identification and her mother's ashes.

Additional evidence collected included a cell phone appellant procured for A.J. that contained semi-nude pictures of A.J. and that had been used to connect with appellant's cell phone 70 times between April 6 and April 7. Copies of these pictures, and other similar photographs were also found on appellant's cell phone. A

3

> laptop connected to appellant also appeared to have accessed sites used for prostitution and uploaded at least one image which appeared to depict A.J. at the motel where she was located. Another laptop found in a storage unit rented by appellant contained additional evidence of prostitution advertisements. Also, in the storage unit were personal items and paperwork belonging to S.M. Additional electronic evidence connected appellant to multiple advertisements for prostitution involving S.M. and occurring at the motel where A.J. was located. Finally, multiple text messages between appellant and S.M. were introduced showing him directing her activities as a prostitute.

(Doc. 17-8 at 2-5). The appellate court affirmed Petitioner's convictions. (*Id.* at 17). On February 10, 2021, the California Supreme Court summarily denied review. (*See* Doc. 17-10).

Petitioner now presents three grounds for relief, arguing (1) he was denied his right to confront his accuser when the prosecution was allowed to introduce body camera footage and a transcript of the conversation between A.J. and police; (2) the admission of A.J.'s statements also violated his due process rights; and (3) there was insufficient evidence to establish A.J.'s age. (Doc. 1 at 5-8).

## II.     STANDARD FOR FEDERAL HABEAS RELIEF

A federal court's statutory authority to issue habeas corpus relief for persons in state custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA requires a state prisoner seeking federal habeas relief to first "exhaust[t] the remedies available in the courts of the State."[4] 28 U.S.C. § 2254(b)(1)(A). Where the state court adjudicates the claim on the merits, a petitioner is not entitled to habeas relief unless the adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Deciding whether a state court's decision 'involved' an unreasonable application of federal law or was 'based on' an unreasonable determination of the facts requires the federal

---
[4] The statute allows for limited exceptions inapplicable here. *See* 28 U.S.C. § 2254(b)(1)(B).

habeas court to 'train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). When the state court's decision "does not come accompanied with [its] reasons" for the decision, a federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Id.* However, when there is no reasoned decision to "look through," it may be presumed—in "the absence of any indication or state-law procedural principles to the contrary"—that the state court adjudicated the claim on the merits and the petitioner must show "there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98-99 (2011).

Under § 2254(d)(1), a decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle but applies the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 62 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "State courts are accorded substantial deference. If

5

1  reasonable minds reviewing the record might disagree about the finding in question, on habeas
2  review that does not suffice to supersede the trial court's determination." *Marks v. Davis*, 106
3  F.4th 941, 949 (9th Cir. 2024) (citations and quotation marks omitted) (quoting *Brumfield v.*
4  *Cain*, 576 U.S. 305, 314 (2015)).

**III.   ANALYSIS**

   **A. Ground One – Right to Confront Witnesses**

In ground one, Petitioner alleges he was denied his "Crawford right to confront his accuser at trial." (Doc. 1 at 5).

   **1. Background**

During the preliminary hearing, A.J. "shut down on cross-examination and vividly and clearly refused to testify any further which led to [a] stipulation to strike her testimony." (Doc. 17-4 at 163; *see* Doc. 17-1 at 74-86). Based on A.J.'s refusal to testify, the prosecution argued A.J. was unavailable for trial and moved to admit statements A.J. made to officers, including the body camera footage of her initial encounter with officers. (*See* Doc. 17-1 at 151-53). The trial court held extensive hearings on the parties' motions in limine, including the request to admit A.J.'s statements. (*See* Doc. 17-4 at 14-157).

During the hearing, Officer Jeremy DeMoss testified regarding his interaction with A.J on April 6, 2017. (Doc. 17-4 at 57-76). Through DeMoss's testimony, the prosecution offered the body camera footage and a corresponding transcript. (*Id.* at 62-63; *see* Doc. 17-1 at 179-84). The transcript shows that when officers initially contacted A.J., they asked her name, whether she had an ID, and how old she was, to which she responded 17. (Doc. 17-1 at 180). The officers continued to ask A.J. for her personal information and she asked, "Can we please get out of here?" (*Id.* at 181). The officer asked if she wanted to sit in the back of the car, to which A.J. responded, "I really don't want to get caught." (*Id.*). When asked what she was doing, A.J. responded, "My pimp." (*Id.*). A.J. indicated she had called the human trafficking hotline earlier. (*Id.*). The officers assured A.J. they were "here to help" and that she was "not in trouble or anything." (*Id.* at 182). A.J. then stated, "He's going to kill me!" (*Id.*). The officers assured A.J. they would protect her and asked whether "he" was there at the time. (*Id.*). A.J. subsequently

indicated she used the name Kay Underwood when she called the hotline. (*Id.* at 183).

In ruling on the prosecution's request, the trial court recognized the outcome turned on whether the statements were testimonial based on *Crawford v. Washington*, 541 U.S. 36 (2004) and *Davis v. Washington*, 547 U.S. 813 (2006). (*Id.* at 163-64). Ultimately, the trial court determined A.J.'s statements were not testimonial because the "officers were responding to an ongoing emergency;" the environment "was not tranquil as reflected by [A.J.'s] fear of being killed, crying, and her fright upon seeing defendant's vehicle;" and "the officers were attempting to ascertain the identity of the person giving rise to [A.J.'s] fears and emotions." (*Id.* at 166). Thus, the court granted the prosecution's request to admit the statements. (*Id.* at 166-67). The video and transcript were admitted as evidence at trial. (*Id.* at 226-27).

On appeal, Petitioner argued "the admission of A.J.'s statements to police as reflected in the body camera video and related transcript" "violated 'his Sixth Amendment right to confront and cross-examine the witnesses against him under *Crawford*.'" (Doc. 17-8 at 8). The appellate court explained Petitioner's argument turned "on whether the statements admitted qualify as testimonial under the *Crawford* analysis" and concluded they did not. (*Id.*). After setting forth the relevant law under *Crawford* and decisions from the California Supreme Court, the appellate court explained its ruling:

> A full review of the body camera interview and the officers' testimony concerning the event demonstrate this case is more like those cases involving questions posed during an emergency than those cases dealing with more formal statements. The police were searching for a human trafficking victim who had called a hotline seeking help. They had limited information about the person's appearance and had been given a false name. Upon locating the potential victim and asking basic identity questions, the person they were speaking to expressed concern about remaining in a public space and indicated she feared for her life. In response, the police asked a limited and specific set of questions designed to identify who was causing that fear in their victim. Notably, while it may generally be the intent of police in this situation to get as much information as possible, the record does not show the police made such an attempt here. Police asked no questions about past sexual activities, where she may have been trafficked, or how she came into her circumstances. Rather, they asked specific questions about how to identify the person she claimed would kill her.
>
> Although the situation is different in nature from the immediacy of a domestic violence call or other similar situations in the case law,

7

> the crime of human trafficking is not so different that the initial contact with a potential victim stating a current fear of harm should be deemed sufficiently formal and lacking in emergency to warrant application of the confrontation clause. Here, at least as reflected in the body camera transcript that was introduced and related testimony, the police were engaged in a process designed to identify and secure a potential victim of human trafficking. Their questions and actions were not designed to identify past facts or build a case, but rather were focused on their need to properly identify the person they were speaking with and respond to her statement of immediate fear. Objectively, the primary purpose of the interactions was to resolve an ongoing emergency and aid in identifying and apprehending an unknown individual purportedly involved in an ongoing criminal activity. The statements introduced were thus not testimonial and, therefore, appellant's right to confront those witnesses against him was not violated by their introduction.

(*Id.* at 10-11).

### 2. Arguments and Analysis

Petitioner argues the state court's determination that A.J.'s statements were nontestimonial was contrary to *Crawford* and *Davis*. (Doc. 11 at 29). Specifically, Petitioner argues the appellate court failed to cite and discuss *Hammon v. Indiana*, 547 U.S. 813 (2006), where the United States Supreme Court concluded statements were testimonial because there was no emergency in progress; the questioning was not to determine what was happening, but rather what happened; and the statements were made in a more formal setting. (*Id.* at 31-35). Petitioner asserts the questioning here "concerned what had happened, rather than what was happening," "[t]here was no pending emergency," and, while the appellate court concluded the questioning was not formal, it was "just as formal as in *Hammon*" such that the statements here should also be considered testimonial. (*Id.* at 34-35).

Respondent argues "A.J.'s statements fall squarely in the emergency category of nontestimonial statements contemplated by *Davis* and its progeny" because the officers "had information that A.J., who was a minor, had called the human trafficking hotline and had been possibly kidnapped" and "[n]either the officers nor A.J. knew where A.J.'s pimp was located, who A.J.'s pimp was with, or whether he was armed when A.J.'s challenged statements were made." (Doc. 19 at 17). In addition to arguing the statements were made as events were happening and while officers believed they were dealing with an ongoing emergency, Respondent

8

cites the "casual nature" of the interaction to support that the statements were nontestimonial. (*Id.* at 18-19). Thus, Respondent asserts "Petitioner failed to demonstrate that no-fairminded jurist could agree with the California Court of Appeal's decision that A.J.'s statements to the officers at the scene were nontestimonial, especially given the wide discretion that that decision is afforded." (*Id.* at 20). Additionally, Respondent argues "Confrontation Clause violations are subject to harmless error analysis" and "[e]ven without A.J.'s challenged statements, the jury would have convicted Petitioner on all counts" such that Petitioner cannot show the statements had a substantial and injurious effect or influence on the verdict. (*Id.*).

Petitioner replies that "[l]ike the California Court of Appeal," Respondent "ignores *Hammon*," which Petitioner asserts is contrary to the state court's decision. (Doc. 26 at 2). Petitioner reasserts his argument that there was no emergency in progress at the time of A.J.'s statements and that officers were questioning her regarding past events. (*Id.*).

As an initial matter, while Petitioner cites *Hammon* as separate from *Davis*, the undersigned notes that the United States Supreme Court decided the two cases together in a single opinion. *See Davis*, 547 U.S. at 813-15. The Supreme Court explained in *Davis*:

> The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), we held that this provision bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." A critical portion of this holding … is the phrase "testimonial statements." Only statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause. See *id.*, at 51, 124 S.Ct. 1354. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.

547 U.S. at 821. In *Davis*, the Court held that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* at 822. Conversely, statements "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or

prove past events potentially relevant to later criminal prosecution." *Id.* at 822-23.

A review of the facts in *Hammon*, as discussed in *Davis*, is warranted based on Petitioner's arguments. There, police responded to a domestic violence call and found the victim, Amy Hammon, alone on the front porch. *Davis*, 547 U.S. at 819. Amy appeared frightened but told officers "nothing was the matter" and allowed them to enter the home, where an officer saw "a gas heating unit in the corner of the living room that had flames coming out of the partial glass front" with pieces of glass on the ground around it. *Id.* (quotations and alterations omitted). Police also encountered Hershel Hammon, who informed police he and his wife had been arguing but "'everything was fine now' and the argument 'never became physical.'" *Id.* Amy came back inside, and one officer went to talk with her and ask what occurred while another officer stayed with Hershel. *Id.* Hershel "made several attempts to participate in Amy's conversation with the police, but was rebuffed." *Id.* at 819-20 (citation omitted). Amy provided an account to the officer and completed an affidavit indicating Hershel "Broke our Furnace & shoved me down on the floor into the broken glass. Hit me in the chest and threw me down. Broke our lamps & phone. Tore up my van where I couldn't leave the house. Attacked my daughter." *Id.* at 820. When Amy did not appear at Hershel's domestic battery trial, the responding officer was asked to "recount what Amy told him and to authenticate the affidavit." *Id.*

The Supreme Court concluded Amy's statements were testimonial. *Id.* at 829. It explained:

> It is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct—as, indeed, the testifying officer expressly acknowledged, App. in No. 05–5705, at 25, 32, 34. There was no emergency in progress; the interrogating officer testified that he had heard no arguments or crashing and saw no one throw or break anything, *id.,* at 25. When the officers first arrived, Amy told them that things were fine, *id.,* at 14, and there was no immediate threat to her person. When the officer questioned Amy for the second time, and elicited the challenged statements, he was not seeking to determine (as in *Davis*) "what is happening," but rather "what happened." Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer *should* have done.

*Id.* at 829-30.

10

Turning to the present case, while Petitioner is correct that the appellate court did not cite directly to *Davis* in rejecting his claim, it correctly set forth the *Davis* standard for determining whether statements are testimonial. (*See* Doc. 17-8 at 9-10 (citing *People v. Nelson*, 190 Cal. App.4th 1453, 1464-66 (2010) (discussing *Davis*))). The appellate court then reviewed the circumstances surrounding A.J.'s statements, observing that the "police were searching for a human trafficking victim who had called a hotline seeking help;" they "had limited information about the person's appearance and had been given a false name;" and A.J. "expressed concern about remaining in a public space and indicated she feared for her life" and in response, "the police asked a limited and specific set of questions designed to identify who was causing that fear in their victim." (*Id.* at 10-11). Importantly, the appellate court noted that "[p]olice asked no questions about past sexual activities, where [A.J.] may have been trafficked, or how she came into her circumstances. Rather, they asked specific questions about how to identify the person she claimed would kill her." (*Id.* at 11).

Thus, unlike in *Hammon*, where the victim explicitly denied any ongoing issues and officers did not observe anything to indicate such, A.J. was actively seeking help from officers and expressed fear over being discovered. Additionally, A.J.'s statements were directed specifically toward identifying Petitioner, rather than describing any past incidents that may have occurred. Based on the circumstances surrounding A.J.'s statements and the focus on protecting A.J. and identifying Petitioner, it cannot be said that the primary purpose was to investigate past crimes. Accordingly, A.J.'s statements were nontestimonial and the state court's rejection of Petitioner's claim was not contrary to, or an unreasonable application of, *Davis*. The undersigned recommends ground one be denied.

**B. Ground Two – Due Process Confrontation Right**

In ground two, Petitioner argues A.J.'s statements "not only violated his constitutional right to confrontation, but rather due process rights in a way that affected his conviction on all counts." (Doc. 1 at 7).

**1. Background**

On direct review, the state appellate court addressed Petitioner's argument that "there is a

separate and distinct due process right under the Fourteenth Amendment to confront and cross-examine adverse witnesses that can be violated even if the Sixth Amendment confrontation right is satisfied." (Doc. 17-8 at 11-12). After discussing Petitioner's reliance on *Morrisey v. Brewer*, 408 U.S. 471 (1972), which addressed the right of confrontation in parole revocation hearings and related cases dealing with the right of confrontation in civil proceedings related to criminal proceedings, the appellate court rejected Petitioner's claim, explaining:

> As explained in *Strickland v. Washington* (1984) 466 U.S. 668, 684–685, "[t]he Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment . . ." Accordingly, we conclude that to the extent a due process right to confront witnesses arises as a separate and independent right from the confrontation clause, that right is necessarily less than that contained in the confrontation clause itself, which defines the full scope of the right in the most critical of situations, the criminal trial. As all forms of the right to confront one's witnesses are triggered upon the introduction of testimonial hearsay, regardless of the scope of the due process right a failure to demonstrate the contested evidence comprises testimonial hearsay precludes a due process claim raising confrontation clause issues. We have previously concluded the statements in this case do not rise to the level of testimonial hearsay and, therefore, reject appellant's claim his due process right to confront witnesses was violated in this instance.

(*Id.* at 14).

### 2. Arguments and Analysis

Beyond his initial statement in the Petition that the admission of A.J.'s statement violated his due process rights, Petitioner failed to present any substantive argument or identify any relevant case law establishing a due process right to confrontation separate from the Sixth Amendment right. (*See* Doc. 1 at 7, 16-35).

Respondent argues that while "probationers and parolees facing revocation have a Fourteenth Amendment right to confrontation" under *Morrissey*, "the Supreme Court has not applied this Fourteenth Amendment right to defendants facing criminal prosecution." (Doc. 19 at 23-24). Accordingly, Respondent argues Petitioner's claim is barred. (*Id.* at 24). Alternatively, Respondent argues Petitioner is not entitled to habeas relief because "the Fourteenth Amendment right to confrontation afforded probationers and parolees is *less generous* than the Sixth Amendment right to confrontation afforded defendants facing criminal prosecution" such that "a

fair-minded jurist could agree with the California Court of Appeal that Petitioner is not entitled to relief on this claim." (*Id.* at 18). Finally, Respondent argues Petitioner "cannot demonstrate he was prejudiced by the purported failure to apply the Fourteenth Amendment right to confrontation." (*Id.* at 25).

In his traverse, Petitioner asserts that the Supreme Court has established a Fourteenth Amendment right to confrontation and cross-examination on numerous occasions. (Doc. 26 at 5). Petitioner cites three cases in support of his assertion: *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *In re Gault*, 387 U.S. 1, 42-43 (1967); and *Hannah v. Larche*, 363 U.S. 420, 504 (1960).[5]

As Respondent argues, the Supreme Court has not recognized a Fourteenth Amendment right to confront witnesses in the criminal context. Petitioner is correct that the Supreme Court explained in *Chambers* that the "rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." 410 U.S. at 294. However, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing such a claim." *Hall v. City of Los Angeles*, 697 F.3d 1059, 1068 (9th Cir. 2012) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)). It follows that because the Sixth Amendment, as addressed above, specifically protects a defendant's right to confront witnesses, the Fourteenth Amendment's due process protection does not grant any *additional* confrontation rights. The cases cited by Petitioner do not support a contrary conclusion. *See Hannah*, 363 U.S. at 421-22 (addressing whether due process extended the right to confrontation to cases before the Commission on Civil Rights); *id.* at 440 (noting that "the requirements of due process frequently vary with the type of proceeding involved"); *see In re Gault*, 387 U.S. at 56 (recognizing that "confrontation and sworn testimony by witnesses available for cross-examination were essential

---

[5] As Petitioner did not present any argument or cite these cases until his traverse, his argument on ground two is properly deemed waived. *See United States v. Becerra*, 164 F.3d 631 (9th Cir. 1998) ("Claims raised for the first time in a traverse brief are waived.") (table decision). However, as discussed herein, even considering these cases, Petitioner is not entitled to relief.

for a finding of 'delinquency'" in juvenile proceedings).

Because Petitioner's confrontation claim is properly analyzed under the Sixth Amendment and, as discussed above, fails on the merits, the undersigned recommends ground two be denied.

**C.   Ground Three – Sufficiency of the Evidence**

In ground three, Petitioner argues there was insufficient proof of A.J.'s age to support that she was a minor when the only evidence beyond her statements in the video was her driver's license. (Doc. 11 at 8).

**1.   Background**

The state appellate court rejected Petitioner's sufficiency claim on appeal, explaining:

> Appellant's final argument on appeal is that the People failed to prove A.J. was a minor at the time of the relevant charges. Appellant contends there was insufficient evidence on this point because A.J.'s statements to police that she was 17, were improperly admitted as was the only other evidence of her age, her California driver's license. As explained above, we conclude that A.J.'s statements to police were admissible, meaning sufficient evidence of A.J.'s age is properly in the record to support the conviction. We further note that in addition to the two pieces of evidence cited by appellant, additional circumstantial evidence in the form of testimony from A.J.'s social worker, who stated she manages minor wards of the court, was also present. Accordingly, we reject appellant's claim that insufficient evidence supported his conviction on counts 4–7.

(Doc. 17-8 at 17).

**2.   Arguments and Analysis**

Besides the initial statement of ground three, Petitioner once again fails to put forth any argument in support of his insufficient evidence claim in the Petition. (*See* Doc. 1 at 8, 30-35). Respondent argues "a fair-minded jurist could conclude that the prosecution met its burden of proving that A.J. was a minor at all relevant times" based on A.J.'s statements to the officers, "a certified copy of a document from the California Department of Motor Vehicles, which included A.J.'s date of birth," and testimony from A.J.'s social worker indicating that she "managed minor wards of the court, which included A.J." (Doc. 19 at 26-27). In his traverse, Petitioner renews his argument that A.J.'s statements were improperly admitted in violation of the confrontation clause and additionally argues that "it is possible that A.J. gave false information to the

14

Department of Motor Vehicles" and the "violation of the confrontation clause precluded petitioner from making that argument." (Doc. 26 at 5-6).

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Under *Jackson v. Virginia*, 443 U.S. 307 (1979), which sets forth the federal standard for determining a sufficiency of the evidence claim, such a claim "can only succeed when, viewing all the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Johnson v. Montgomery*, 899 F.3d 1052, 1056 (9th Cir. 2018). Federal courts look to state law for the elements of the specific offense at issue. *Maquiz v. Hedgpeth*, 907 F.3d 1212, 1218 (9th Cir. 2018). When a federal habeas court reviews an insufficiency claim previously rejected on the merits by the state court, "a second level of deference applies under AEDPA" such that, to prevail, a petitioner must show that the "state court's determination that a rational jury could have found each required element proven beyond a reasonable doubt was not just wrong but was objectively unreasonable." *Johnson*, 899 F.3d at 1056-57.

Here, Petitioner only challenges the sufficiency of the evidence to support that A.J. was under 18 years of age for purposes of California Penal Code §§ 236.1(c) and 266. To the extent Petitioner's challenge is based on a renewal of his confrontation clause claim, such claim fails for the reasons discussed above. The evidence supporting A.J.'s age included (1) her statement to the officers that she was 17; (2) her statement that her date of birth was January 19, 2000; and (3) a copy of A.J.'s driver's license confirming her date of birth, admitted without objection through the testimony of Grant Bradford. (Doc. 17-1 at 180-81; Doc. 17-3 at 4-5; *see* Doc. 17-4 at 617). Additionally, A.J. told officers she lived with foster parents. (Doc. 17-1 at 181-82). At trial, Jesica Rubio Martinez testified that she was a social worker for the Department of Social Services for Fresno County; she worked "to find permanency and stability for the minors" who were wards of the court in cases assigned to her; and A.J. was a minor that she was working to find placement for. (Doc. 17-4 at 305-07). This evidence was more than sufficient to support that A.J. was under 18 at the time the events occurred in April 2017. Thus, the state court's decision was not

15

"objectively unreasonable" as required for Petitioner to be entitled to habeas relief. *Johnson*, 899 F.3d at 1056-57.

Accordingly, the state court's rejection of Petitioner's sufficiency of the evidence claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts. The undersigned recommends that ground three be denied.

## IV.   CERTIFICATE OF APPEALABILITY

"[A] state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his application." *Miller-El v. Cockell*, 537 U.S. 322, 335-36 (2003). Rule 11 of the Rules Governing § 2254 Cases requires a court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability will issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this showing for claims rejected on procedural grounds, a movant must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of denial of a constitutional right and that jurists of reason would find it debatable whether the district was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a claim is rejected on the merits, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong" to warrant a certificate of appealability.

Because Petitioner has not made a substantial showing of the denial of a constitutional right, the undersigned recommends that the court decline to issue a certificate of appealability.

## V.   RECOMMENDATION

For the reasons set forth above, it is **RECOMMENDED**:

1. Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. 11); and
2. Petitioner be denied a certificate of appealability.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the

16

United States District Court, Eastern District of California.  Within **14 days** of service, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations" and **shall not exceed 15 pages** without leave of Court and good cause shown.  The Court will not consider exhibits attached to the Objections.  To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity.  Any pages filed in excess of the 15-page limitation may be disregarded by the District Judge when reviewing the Findings and Recommendations under 28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time may waive the right to appeal the district judge's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:  **May 16, 2025**                                    _____
                                                                            UNITED STATES MAGISTRATE JUDGE